## SWINT *v.* THE STATE.

1. The evidence, independently of the confession, was sufficient to establish the corpus delicti.
2. "A confession alone, uncorroborated by other evidence, will not justify a conviction." Penal Code, § 1031.
(*a*) Proof of the corpus delicti and of a confession freely and voluntarily made will authorize the jury to convict. *Wimberly* v. *State*, 105 *Ga.* 188 (31 S. E. 162); *Chancey* v. *State*, 141 *Ga.* 54 (5) (80 S. E. 287).
(*b*) The jury was authorized to find from the evidence that the confession of the defendant was freely and voluntarily made, and that it was corroborated.
3. In view of the general charge of the court, the excerpts therefrom set out in the motion for new trial are not erroneous.
4. The failure to charge, as complained of in the motion for new trial, is without merit, in view of the general charge.
5. The verdict is supported by the evidence, and the court did not err in refusing a new trial.

No. 4627. MARCH 12, 1925.

Dynamiting residence. Before Judge Wright. Floyd superior court. October 29, 1924.

*F. W. Copeland* and *M. B. Eubanks*, for plaintiff in error.

*George M. Napier, attorney-general, E. S. Taylor, solicitor-general, J. F. Kelly, solicitor-general, T. R. Gress, assistant attorney-general, Porter & Mebane* and *Neal Andrews*, contra.

HILL, J. Will Swint was indicted and tried for the offense of "felony," the indictment alleging that on the 15th day of April, 1924, the defendant did "unlawfully and with force and arms, wilfully and maliciously destroy and injure the dwelling of John W. Bobo, by and with the use of dynamite, powder, nitroglycerine, and with other specific substances to the grand jurors unknown, the said John W. Bobo then and there and at said time residing in said dwelling-house and the

said dwelling-house not then and there being located in any town
or city." The jury found the defendant guilty, and recommended
him to the mercy of the court; and he. was sentenced to life im-
prisonment. He made a motion for new trial, which was overruled,
and he excepted. On the trial the State relied for conviction upon
a written confession signed by the defendant, and corroborating
circumstances and facts independently of the confession, to estab-
lish the corpus delicti. The confession was as follows: "I am
making this affidavit of my own free will and accord, without any
fear of punishment or hope of reward, and freely and voluntarily.
I have not been promised any aid, assistance, or help in any way,
or by any officer of the court, in any matters now pending or may
hereafter pend in any court or in any other matter. I want to
tell the whole truth, and am going to tell it now. In the begin-
ning, I saw Frank Williams, Carl Lemaster, and Walt Hedgepath
in Hedgepath's car about 7 o'clock p. m., Monday, April 14, 1924,
coming down the old Lindale pike to 12th street, turn and go to-
ward South Rome. The next time I saw them was about 8:30
p. m. They drove up to Williams' store, got out, and stood near
Adams' shop where I was, but they could not see me. They stood
there discussing plans to blow up Bobo's house, and while there
took a drink of whisky, then all three of them went into the stand
and got something to drink, and possibly something to eat. I
came out and went to Hedgepath's car and looked in it. I saw
laying on the front seat four sticks of dynamite and four or five
feet of fuse. About this time Walt Hedgepath walked up, and I
asked him, 'What are you doing with dynamite?' and at this time
Frank Williams walked up, and Hedgepath said, 'We are going
to have some fun,' and Williams said, 'We are going to blow hell
out of John Bobo's house.' They asked me if I didn't want to go
with them. I told them I could not go, that it was too early, and
had a date also. I gave them a drink, and they soon left. I met
them again when they drove up to Williams' stand about 11:30
p. m., and they asked me again to go with them. I told them no,
that it was too early, but I would go a little piece with them, and
I got on the running-board and we went down the Lindale pike
towards Lindale, and we talked it over and planned it all together,
and Frank and Carl said they would do it. At this time I noticed
they had two sticks of dynamite fixed with fuses, but I did not see

the other two sticks any more that I first saw. I got off the car near old man Sanders' house, and went up to the barn where I was to meet May Cox. They were to come back after me at 12:30 and blow their horn and let me know it was them; and it was about this time when they returned for me. I got in the car and we drove down the Lindale pike, and driving slowly and quietly when we stopped 50 yards from John Bobo's house. Frank and Carl got out, leaving me in the front seat and Hedgepath driving, with the understanding that the doors were to stay open and Hedgepath was to start the motor when we would see them strike the matches down close to Bobo's house in the yard. Carl and Frank each threw a stick of dynamite, one under and one on the porch, and I could see the lighted fuse sparked like a firecracker. Carl and Frank hurried down and got in the car, and we drove rapidly away. We were some distance away when we heard the explosion, and both seemed to go off about the same time. We drove down the road about one mile, turned out to the left, crossed to the Cartersville pike toward Rome; upon our arrival at 14th street I got out at the little blacksmith-shop, went down 14th street on around home and got there about 1:25 a. m. Before 6 o'clock the morning of April 15th (Tuesday) a long, tall fellow came to my house and wanted a drink of whisky, and I gave him a drink, and then went down to Williams' stand and I saw Frank Williams, Carl Lemaster, and Walt Hedgepath all seated on the porch, and Hedgepath's car was standing near by. Carl said, 'Give me a drink, we have been up all night and have not been to sleep the whole night. I gave Carl and Frank a drink. Walt said he did not want a drink, because he was feeling sick at his stomach from being up all night. I asked them what luck, and they said, 'Don't think we did much good.' I have told all, and am not trying to keep anything back. This is the first time I ever saw dynamite used, and have never used any, and know nothing about how to use it. Hedgepath said the dynamite they had came from the chain-gang camp."

So far as material here, the court charged the jury as follows: "The State contends that it has proved upon the part of the defendant a confession of his guilt. You look and see what the evidence shows about that. I charge you that confessions should be scanned with care and should be received with great caution,

and that a confession alone will not authorize a conviction. A confession must be freely and voluntarily made; it must be made without the slightest hope of reward or the remotest fear of punishment. If there is the slightest hope of reward, or the remotest fear of punishment, the confession is a nullity and amounts to nothing in law. So, under this rule, see whether he made a confession, see whether he did so freely and voluntarily, in the way I explained to you; and if you find he has, then the confession will go to you, along with all the other evidence in the case, to aid you, if it does aid you, in determining whether the defendant in the case is or is not guilty. If you find there was no confession made, you will not consider the evidence relating to it; if you find there was a confession, then consider it with the law I shall now give you in charge, in determining whether the defendant is guilty or not. As I stated a moment ago, this defendant is indicted for the offense of using dynamite to destroy a home, to injure or destroy the home of Mr. Bobo; and in this connection, I give you this law in charge: The wilful and malicious destroying or injuring any dwelling-house, storehouse, barn, depot, and other place of business or lodging place of any person, wherein any person shall lodge or reside, or so nearly connected therewith as to endanger the life of any person being or so dwelling therein, not within the limits of any city or town, with or by the use of dynamite, powder, nitroglycerine, or any other explosive substance or compound, shall be punished with death, or the punishment may be commuted in conformity with section 63 of this code. So, look to the evidence and see whether this defendant wilfully and maliciously (both those things must appear) did injure or destroy the dwelling-house mentioned in the indictment. If so, he would be guilty; otherwise he would not be guilty. In determining whether or not this defendant is or is not guilty, I charged you a moment ago that he could not be convicted upon his uncorroborated confession, if he made a confession; that a confession alone would not authorize a conviction. Now what amount of corroboration is necessary to authorize the jury to find a verdict of guilty upon a confession is a matter entirely for the jury to determine; but it should be such corroborating circumstances as, independently of the confession, tend to connect the defendant with the offense. And so, in this case, look and see whether or not there are corroborating

circumstances, and whether they are in your opinion sufficiently strong to corroborate the confession, if a confession was made, and authorize you to return a verdict of guilty. I charge you, to authorize you to return a verdict of guilty upon confession and upon proof of what we term in law the corpus delicti, that is, that somebody used dynamite to injure or destroy the home of Mr. Bobo, that such corpus delicti, such proof of the actual commission of the crime, must be clearly and unequivocally established; and if it is so clearly and unequivocally established, it still remains a question for the jury to determine whether it is or is not sufficient corroboration of the confession, if there was a confession, to authorize you to convict."

In addition to the general grounds the plaintiff in error has seven special grounds of the motion for new trial. These grounds complain of the charge as given, and of the failure of the court to charge certain principles of law. Movant insists that in charging as to the proof of the corpus delicti as corroborative of the alleged confession, the court failed to charge the jury that the corpus delicti must be clearly and unequivocally established by the evidence independent of the alleged confession, and nowhere charged the jury that the alleged confession could not be used by the jury for the purpose of establishing the corpus delicti, it being insisted by movant that there was no evidence independent of the alleged confession to establish the corpus delicti clearly and unequivocally, and that as a matter of law the alleged confession could not be considered for the purpose of establishing the corpus delicti, etc. It will be observed from reading the charge of the court set out above that he instructed the jury: "What amount of corroboration is necessary to authorize the jury to find a verdict of guilty upon a confession is a matter entirely for the jury to determine, but it should be such corroborating circumstances as, independently of the confession, tend to connect the defendant with the offense. . . To authorize you to return a verdict of guilty upon confession and upon proof of what we term in law the corpus delicti, that is, that somebody used dynamite to injure or destroy the home of Mr. Bobo, that such corpus delicti, such proof of the actual commission of the crime, must be clearly and unequivocally established; and if it is so clearly and unequivocally established, it still remains a question for the jury to determine whether it is or is not

sufficient corroboration of the confession, if there was a confession, to authorize you to convict." We are of the opinion that, taking the charge as a whole it is not open to the criticism directed against it. If a fuller charge on the subject was desired, a timely written request therefor should have been made.

Movant further insists that the court failed to charge and should have charged that even though the jury find that a confession was made, as contended, by the State, yet, before the defendant could be convicted thereon, it must be made to appear that the alleged confession was true, and that such confession might be contradicted and impeached by any other competent evidence in the case; and that if the other evidence in the case satisfies the jury that the confession was not the truth, or was sufficient to raise a reasonable doubt as to its truth, then the jury should disregard the alleged confession altogether. We are of the opinion that, in the light of the evidence and the entire charge of the court, this ground of the motion is without merit. The other grounds of the motion are likewise without merit. We are of the opinion that the charge as a whole covered the issues in the case, and correctly charged the principles of law applicable thereto. If fuller instructions were desired upon any particular phase of the case, a timely written request should have been made therefor.

One other important question is to be considered. Did the evidence, independently of the confession, establish the corpus delicti, and otherwise corroborate the confession? Material portions of the evidence for the State are as follows: John W. Bobo testified, in part, as follows: "My home is on the Rome and Rockmart public road, and is back from the road about 25 or 30 yards on the south side. I was at home on or about the night of the 15th of April, 1924. My family consists of my wife, myself, and my sister-in-law was with us then, my wife's sister, Mrs. Knox. She was living with us at the time. About one o'clock on the morning of the 15th of April I was awakened by something like a crash. I did not hear an explosion, I heard a crash and glass breaking. I heard the crash and glass breaking, and I jumped out of the bed, and just as I did that I smelled powder or something like that, smelled burned powder, and I ran into the sitting-room, and I noticed as I ran. I turned the light on though, grabbed my gun and ran in there, and there was glass all over the floor, and just

as I got into the sitting-room I could see the windows, the windows were blown out, and some of the planks on the porch were hanging down. I could see them. The light on the front porch had blown out. I turned the light on there, and then I could see what happened. It was the corner of the porch, the column had blown out and one post went that way and the other this way [indicating], just spread out like that. They turned in the opposite direction, and of course I saw what had happened at that time. There was a hole blown in the porch floor, a hole about a foot wide and a foot and half long, blown down between the outside sill and the first flooring joist. After I got lights in the sitting-room, I went outside and investigated. I found some tracks leading off from the front of the house. I found an empty match-box laying near a magnolia tree; it was a penny match-box, and I picked it up and examined it, and I discovered it was dry, and I remarked at the time it was dry, it had no dampness on it whatever. It was not under the tree, it was near the porch there. The grass around where it was found was wet, and the match-box was dry. I guess that match-box was about five or six feet from the corner of the porch, and about the same distance from the hole in the floor. Besides the damage to the floor, the hole in the floor was blown in there and in the ceiling, there was three or four planks blown out of the overhead ceiling, and the ceiling was blown loose for fifteen or twenty feet, that is, it did not blow down, but sagged down three or four inches, and the nails in the weatherboarding on the house—some of them the next day were sticking out from a quarter to a half inch, and it blew the quarter-round from overhead, and blew out $32 worth of windows upstairs and downstairs, front window panes to the house. Mrs. Bobo and I were occupying the bedroom. . . I smelled powder, and I have smelled dynamite explosions, and it smelled very much like a dynamite explosion. . . After the chain-gang dogs got there we went up there, and there were tracks that ran from this ditch above Dr. Cheney's and around in front of my house and came to the front; we could not tell there were any tracks at all across the road, because it was hard chert; but when you cross the road you struck the tracks, there seemed to be two sets of tracks, two different tracks coming and going. I mean the tracks of two people. Those tracks led into the road in front of my house. . . The tracks came out and

went into the road there; they were the same tracks, and one of the tracks seemed to be a crippled foot. I noticed that particularly, because we could track that crippled foot more easily. I know Carl Lemaster. I don't know of my own knowledge that he has a crippled foot. Of course I reported this immediately. I have had quite a little bit of experience in the use of dynamite. I have had experience with dynamite since I was thirteen years old. I have been shooting dynamite in mines, rocks, stumps, and various places. There is grease used in connection with dynamite as an explosive. I saw greasy spots or places at the place where the explosion occurred. I don't know of any other kind of explosive that uses grease and leaves greasy places that way. That grease was not there prior to this explosion. . . (Cross-examination.) These tracks out there in the ditch could not have been there long; they looked fresh; it was about one o'clock Monday night or early Tuesday morning, April 15. . . I have been for several years connected with the county police and with the sheriff's office. During that time I have arrested quite a few people. One time I remember about Will—I did not arrest him then, arrested a man that was in the car with him, did not arrest him, but I held him until the police came. . . As to my being an officer, I had a short time before that arrested Frank Williams and Carl Lemaster. I was not with Mr. Williams and Henry Dunnehoo when they arrested Swint in connection with the liquor charge. I do remember the circumstances that I was not present. The footprints in the field were fresh, very recent tracks."

S. L. Graham testified for the State, in part as follows: "I am clerk of the superior court of this county, and was such clerk on the 6th day of May, 1924. I know the defendant in this case, Will Swint. I saw him on the date of that paper, May 6th of this year, over here in the jail. I was called over there to the jail by Mr. Furney, to witness a paper. When I got there I found the paper there. This is the paper that was furnished me. Mr. Swint signed this paper that I have in my hand, Mr. Swint, the defendant in this case. We went to the jail, and Mr. Swint was lying on a cot there, his leg was in plaster of Paris, and Mr. Furney said he had that paper and wanted to know if Mr. Swint wanted to sign it, and Mr. Swint said, 'Read it over to me.' Mr. Furney was reading the paper at the time. I was standing there and he read the paper,

started reading it, and Mr. Swint propped himself up on the bed or cot to listen to it, and about half way down the paper there was something he did not understand, and he said, 'No, that is not right, read it again.' It was something about somebody going in the yard or coming out, and he read it again, and he says, 'Yes, that's right,' and then he read it through to him, and then Mr. Furney said to him, 'Do you want to sign it?' and he said, 'Yes.' I said, 'Are you doing this without fear of punishment or hope of reward?' and he said, 'Yes, I am.' I just happened to remember that question being asked so often here in court, and in answer to my question he said, 'Yes,' and swore to it, and I witnessed it. I swore him; he held up his hand, and I administered the oath. The paper I witnessed there is the statement which was read to him and which he signed himself, with his own name. That's about all that was said, as I remember. There was not anybody present but we three, as I remember."

C. A. Furney testified, in part, as follows: "I am a police officer, Southern Railway. . . At the instance of sheriff Wilson I went to the jail and talked with the defendant in this case, Will Swint, in reference to this dynamiting charge. I do not know how many times I went; several times. He made a statement to me about the dynamiting. Sheriff Wilson, Mr. Trazzare, and myself were all there when he made the first statement, the statement that he signed up. One of those statements was reduced to writing. That [identifying paper] is the statement that he signed. He dictated that statement to Mr. Trazzare, and he wrote it down with a pencil, and then we came over here and wrote it off on the typewriter, came here to the court-house to the sheriff's office and wrote out that statement there. The best I recollect, we carried it back over there that night and read it and the next evening or night. I carried Mr. Sam Graham, the clerk, over there, and he swore to it. I read it over to him myself. That is the identical statement that was read over to him and he signed. It was the night before, I think, that the defendant himself read the same statement; this was on Sunday evening and Sunday night, the best of my recollection; and it was on Monday evening that it was signed up. When I read the statement over to Will Swint just immediately before he signed it, he was sitting on the side of the cot, and I was sitting by the side of him, and as I read it he read it along with me. No

inducement, or hope or promise of reward, or hope of reward or fear of punishment was held out to him. I was at home; he sent for me; when I got there to him he told me he had sent for me. . . The first knowledge I had of it Will told it himself. I did not tell that defendant, that Hedgepath, Williams, and Lemaster were going to put the whole thing on him, and that the result of it would be that it would break his neck if he did not.make the statement that I have in this affidavit. I did not tell him that. I did not hear no such; nobody in my presence or hearing told him that. I did not tell him that this dynamite house had been broken into down about Aragon, and that I was ready to prove that he was there the night it was broken into; he told me about the dynamite; I didn't tell him. I didn't tell him that not a hair of his head would be hurt if he would make this statement, didn't tell him anything of the sort; nobody in my presence or hearing told him anything of that sort. There was nothing said about a hair of his head. I can tell you when that statement was made and how it was made; after Hedgepath was given a preliminary trial Will sent for me and wanted to talk to me, and said, 'I have told the truth about it, and I am going to stick to it. What do you reckon John Bobo will do for me?' and I said, 'If you have told the truth and will stick to it, John Bobo will not hurt a hair of your head,' and that was after the preliminary trial over here. That affidavit was made away before that. I never made that statement before the affidavit; that was made afterwards. The affidavit was made before Hedgepath was given a hearing, and the statement about the hair was made after Hedgepath's preliminary trial. I did not say to this man, Will Swint, before this statement was made, while I was in the cell with him, 'John Bobo is out there right now in the hall.' I never saw Mr. Bobo in the hall. I did not tell him that. I did not say that Bobo was waiting, and that if Swint would make a statement putting it on these other men, that John Bobo would take him out of there and put him in the hospital. Nothing of the sort was ever said."

W. E. Van testified for the State, in part: "I am 69 years old. I had occasion to be over to the jail sometime ago, during the city court here in June. . . I was by myself. To the best of my judgment he [pointing to the defendant] is the man I saw. I don't know how the matter got up. I didn't pay any attention

to it. I remember this—that he said that he had made a confession, and that the others were kicking up about it and raising Cain about it, and that they might hang him but he didn't care; and I said I had rather die with the truth on my tongue than to have to lie on it; and that's about all we said about it. I didn't ask him for any of it. I didn't ask him whether he was there. I just asked him how he was getting along, didn't ask him how anything happened about his leg, or anything else. He said he had made a confession and that the others were raising Cain about it, but that he didn't care, that he had told the truth and he was going to stick to it."

John Lane testified for the State, in part as follows: "He said he heard the explosion that night. He said he was back over there and heard that explosion, said it happened at ten minutes to one o'clock, or ten minutes after one. I forget which he said. He said he was away over home when it happened; he pointed back over the other way and said he was over there, and that was between that point and his home. He went on to say that these boys that were caught were mad with him, they thought that he turned them up. He called the boys' names, Carl Lemaster and Frank Williams, and he says, 'I am satisfied they are the ones that done it,' and I says, 'I have that opinion myself, possibly and another fellow,' and I called another fellow's name, and he says, 'No, I am satisfied he did not have anything to do with it.' The other man's name that I called was not Walt Hedgepath. He then said, 'I am satisfied Frank Williams, Carl Lemaster, and Walt Hedgepath are the parties that done it.' He told me they went to the cement plant to get the dynamite, the cement place below Aragon, and got the dynamite at the cement plant. He said they went there on Friday or Saturday night before the dynamiting, one of those nights, and when they got the dynamite he said they carried it off to a certain place and broke into the box, and there was more dynamite than they wanted, and they left about half of it and put the other in the cement sack and brought it away and put it in some party's house, in a church maybe, for the balance of that night and the next day until they could remove it; then the night of the explosion that the arrangement was made for them to pick him up at this fellow Simon's house on Maple street, where May Cox was staying at, and that they picked him up

there about 12 o'clock, and that night about forty minutes from that time the explosion happened; . . then they came on about 12 o'clock and picked him up and went on through Lindale and Boozville, and they taken the left hand back in there and came into Silver Creek, the other road there at Silver Creek, the Rockmart road, and that they put him out of the car to stand guard for them, and furnished him with a 38 Smith & Wesson pistol; he said Mr. Hedgepath gave him the pistol. He said he stood there close to that place until these boys drove on by and came back and shot the place; he said he was standing guard there. After that then he did not say how he got to the car, but said they all got in the car and went down the Rockmart road a piece and turned off to the left back in some other road there, and that about 2:30 they got in home, and that this other dynamite was hid over there in some old house."

May Cox testified for the State, in part: "He told me that if I did not come up to the barn he would call me to the door and stick a dynamite under me. He said he would blow me like they did Bobo. That aint the way he said it. He said he would put a stick of dynamite at my door and call me to it and throw a bottle of nitroglycerine under my door and blow me into hell like they did Bobo. Now they have it wrong in that paper there, they have it in that paper 'that' and it should be 'they,' and I told them so at the time."

Robert Leah testified, in part, as follows: "He began to tell me. . . He said they had a time to pick him up, about 11 o'clock, these other three men, Walt Hedgepath, Frank Williams, and Carl Lemaster. He said they picked him up, and that he did not know for certain what he was going for until they got down the road a piece, and that then they told him and gave him a 38 pistol, and that they left him and went on down, I forget the road he said they taken, that they left him as a guard, and that Lemaster and Williams went on and planted the dynamite and then came back. I don't remember which way he said they went after that. I says, 'As you have confessed, how did you feel?' I says, 'You did not know whether you blew the women and children up or not.' I says, 'How did you feel after it went off?' He says, 'To tell you the truth about it, we didn't give a damn.' He says, 'We passed the bottle and joked all the way back.' He

said they blew the house with dynamite. He said they had 48 sticks left, and they hid them in the East Rome Baptist church. He said they went a few days ahead and broke into a powder-house at the cement plant this side of Rockmart, and that Williams taken a little hammer and hit the lock one lick and the lock came open. I don't know how he said they went down there when they got the dynamite, only he said Williams hit the lock. I happened to be over there because his mother asked me to go to see him. He told me what he told me himself of his own free will. . . He said he told it because he believed the others were framing up on him. He said he believed they were fixing to frame up on him. He did not tell me he had a promise that if he would tell it they would not hurt a hair of his head."

Joe Riley Hicks testified for the State, in part as follows: "I live kinder east of Aragon. There are two cement plants. The Southern States between Aragon and Rockmart, and the other one is northeast like from Aragon. I live out more in that direction. I have seen Will Swint before. I remember hearing about Mr. Bobo's house being dynamited. When I come to Rome I come by there. I know where Mr. Bobo's house is. I saw Swint before this twice, once about two months before then, and then about two weeks, one or two weeks before, I saw him on Saturday night at Aragon. It looked like there were two or three others with him. I did not know the others. They were in an old Ford, I think; it was dark, and I drove up in front of the barber-shop and saw them sitting over to the right."

R. E. Lawson testified, in part, as follows: "I live in Polk County at Aragon. I know where Mr. Bobo lives at Silver Creek. I heard something about his house having been dynamited in April. I know the defendant in this case, Will Swint, when I see him. On Saturday night before, or some short time before that, I saw him in Aragon. It was on Saturday night that I saw him, but I don't remember the date. I did not know whether it was before the dynamiting or not, but it was before the dynamiting. I saw him there in front of the company's store. He was in a car and there were other parties in there with him, but I don't know them. I was not very close to them. I judge it was between 8:30 and 9:00 o'clock when I saw them. I do not know which way they went from there."

Burl Salmon testified, in part, as follows: "I am deputy sheriff

of this county, and have been for about four years, or some such matter. I know Will Swint, the defendant in this case. I never heard him make any statement about this charge against him; he never talked to me about it. I know where the Hardshell Baptist Church is in East Rome. I went over there the 5th day of May, I think it was. I had information there was a sack in there with some dynamite in it; and Mr. Wright, John Harris, and myself went over there; deputy sheriff Lindsey Wright; and there was a hole cut in the ceiling of the church, and there was a ladder going from the floor up, and 48 sticks of dynamite were up in the loft. I forget the name of the dynamite now."

R. E. Wilson testified, in part, as follows: "I am the sheriff of this county, and have been, this will make four years. I know the defendant, Will Swint. . . Will told me that he knew all about this whole business, and that he wanted to tell it. I had not said anything to him up to that time. I says, 'Will, if you know anything about it and want to tell it,' I says, 'I will go and call Judge Kelly, the solicitor-general, or the assistant solicitor-general rather, and I will have him come here and let you tell it to him.' He says, 'Where is Mr. Furney at?' and I says, 'I do not know whether he is in town or not, I will find out about him also.' Furney was in and out, you know. . . So I went and asked Mr. Trazzare, a partner of Mr. Furney, about his whereabouts. . . So in a little while Judge Kelly drove up, and I told him about it. He came to the court-house and got some paper and came back over there, and Mr. Trazzare, Judge Kelly, and Mr. Furney and I went up to where Will was. At Will Swint's request I sent for Mr. Furney. I understood that they had been friends for a long time. After we got up there Judge Kelly started talking to him. . . Before he made any statement at all, nothing was said to him by anybody by way of inducement or anything of the kind. Judge Kelly did the talking to him there. Judge Kelly told him to go ahead and tell it, and he commenced telling it. He said he, Walt Hedgepath, Carl Lemaster, and Frank Williams were the four that did it. He went into details. He said they went down the Lindale road beyond Boozville, and took the road that turned across the mountain towards Bobo's house; that they were in a Ford car; that it was Hedgepath's car, a touring-car; that Hedgepath was driving it; that just before they got to Bobo's or across

the railroad, he got out of the car and taken Hedgepath's pistol, and that he stood there to guard that end of the road; that the car drove on a little piece beyond there and slowed down, just beyond the negro's house, and then started up and drove up the road just beyond Bobo's house, and that the car was parked there; that Hedgepath stayed in the car; that Lemaster and Frank Williams got out of the car and came around the side of the hill and came down in front of the house across the field, and he said when they struck the match, why he started, says he went back up the road in front of the house to the car. These boys ran out and went back up there through the field the way they came in, and that they all came in the car and drove off. I know Carl Lemaster; he has a crippled foot. Swint told me they met two or three different times over there about 12th street. He told me where the dynamite came from, but not that Sunday; afterwards he did. He said they got it from the Portland Cement plant. He said I was altogether wrong; he said I had made several investigations as to the dynamite in this county and in Polk and Haralson, and he said I had been to the wrong places, that it come from the plant of the Portland Cement Co., at or near Aragon. This plant is three or four miles from Aragon, on the Seaboard Railroad. He said they got it on Saturday a week before the house was blown up. It is about eighteen miles from Rome to Aragon. It is about five miles from Rome to where Mr. Bobo lives. There is a road leading from the main Lindale and Rome road, and Cave Spring road, across the hill towards Silver Creek to Bobo's house. It is not used much, it is a settlement road. . . I will not be positive that he told me what kind of dynamite they got. That dynamite was turned over to me after that by Mr. Salmon. I was here on Monday morning when we got that information. I had to go to Columbus, Georgia, on business, and I turned that matter over to Mr. Salmon and told him to go and get it and to carry it to the chain-gang camp and have it locked up in the magazine. It was Atlas dynamite, 40 per cent. Atlas. I went to the Portland Cement works and saw some of the same kind of dynamite there. I talked to Swint several different times. I was present at the preliminary trial when Walt Hedgepath's trial was on. Swint and I talked about his statement at different times. There was no inducement held out to him, no hope of any reward made to him in any state-

ment I made to him. There was no inducement held out to him in any way in my presence."

The defendant offered in his own behalf members of his own family consisting of his father, mother, two sisters, brother in law, and a young lady visitor, all of whom testified, in support of his defense of alibi, that he was at home all night of April 14 and 15. He offered the evidence of Walt Hedgepath, Frank Williams, Carl Lemaster, and others, tending to show that they had nothing to do with the dynamiting of Bobo's house.

From a careful review of the evidence we are of the opinion that the jury were authorized to find that the confession of the defendant was freely and voluntarily made, and that the confession was sufficiently corroborated to authorize the jury to find the defendant guilty. We are also of the opinion that the corpus delicti is proved by evidence independently of the confession. We find no error in the charge of the court, nor in a failure to charge; and the court did not err in overruling the motion for a new trial.

*Judgment affirmed. All the Justices concur.*